IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30373

_____

COMMERCE AND INDUSTRY INSURANCE COMPANY,

Plaintiff

versus

GRINNELL CORPORATION, Etc.; ET AL.,

Defendants,

_____

IAN DAVID MCAUSLIN, Etc.; ET AL.,

Plaintiffs,

INDEMNITY MARINE ASSURANCE CO. LTD.; SPHERE DRAKE INSURANCE PLC;
LONDON & EDINBURGH INSURANCE CO. LTD.; COMMERCIAL UNION ASSURANCE
PLC; TERRA NOVA INSURANCE CO. LTD.; THE YORKSHIRE INSURANCE CO.
LTD.; CORNHILL INSURANCE PLC; OCEAN MARINE INSURANCE CO. LTD.;
SKANDIA MARINE INSURANCE COMPANY (U.K.) LTD.; AXA MARINE & AVIATION
INSURANCE (U.K.) LTD.

Plaintiffs-Appellants

versus

GRINNELL CORPORATION, Etc.; ET AL.

Defendants

CITY OF NEW ORLEANS, Individually and doing business as City of New
Orleans Fire Department

Defendant-Appellee

--------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
--------------------

February 1, 2002

Before DUHÉ, WIENER, and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

Plaintiffs-Appellants are insurance companies (collectively, "the Insurance Companies") which brought a subrogation suit against, inter alia, Defendant-Appellee City of New Orleans ("the City") to recover payments that they had made to their insured for losses incurred in a warehouse fire. The Insurance Companies now appeal the district court's grant of the City's motion for summary judgment based on Louisiana's discretionary function immunity statute, La. R.S. 9:2798.1 ("R.S. 9:2798.1").[1] Concluding that the Insurance Companies successfully raised genuine issues of material fact on the first prong of the test used to determine whether R.S. 9:2798.1 applies, we reverse the grant of summary judgment and remand the case for further proceedings consistent with this opinion.

## I. Facts and Proceedings

West Coast Liquidators ("WCL") operated a vast warehouse in eastern New Orleans and used it as a distribution center to serve the retail outlets of MacFrugal's Bargains-O-Closeouts, Inc. ("MacFrugal's") in the southeastern United States. Early on the morning of March 21, 1996, WCL employees called the New Orleans Fire Department ("NOFD") after discovering a fire in the portable storage racks in the warehouse. The heat-activated sensors for the automatic sprinkler system were located on the high ceiling, more than 50 feet above the portable shelves where the fire had started. This allowed the fire grow and spread for some 20 minutes before

---

[1] LA. REV. STAT. ANN. § 9:2798.1 (West 1997).

2

the temperature at the ceiling rose sufficiently to activate the sprinkler system.

The result was a five-alarm fire. Four engines and ladder trucks were dispatched initially, but a total of 17 engine companies ultimately participated. In the course of fire-suppression efforts, the NOFD called on the local electrical utility company, New Orleans Public Service, to turn off all power to the building, after first confirming that doing so would not deactivate the sprinkler system. The NOFD later ordered the power restored, but did so without first either having the electrical system checked by an electrical engineer or obtaining a permit. During the course of its continuing fire-suppression efforts following its declaration that the fire was "under control," the NOFD ordered the automatic sprinkler system turned off in an effort to reduce the water damage to merchandise in the areas of the warehouse that were unaffected by the fire. In addition, the NOFD commander at the scene ordered that the large bay doors of the warehouse be opened to ventilate the building, notwithstanding a wind velocity in excess of 20 miles per hour.

The firefighters continued their fire-suppression activities, finally declaring the fire "out" at 11:54 a.m. and thereafter conducting "overhaul" activities — the search for still-smoldering materials or "hot spots" that were not completely extinguished and could re-ignite. In this search, however, they did not inspect the upper levels of the 65-foot fixed racks (which covered the majority of the warehouse), but confined their search to the shorter

3

portable racks.  Six minutes after declaring the fire out —— just before noon —— the NOFD returned responsibility for the facility to WCL employees and departed, leaving one engine and a company of four firefighters as a fire watch.  When the NOFD left, the bay doors were still open and the automatic sprinkler system was still off.

At 2:20 p.m., the fire rekindled in the upper level of the fixed racks, over 275 feet away from the area of the first fire. As the Insurance Companies put it, "[w]ithout any sprinkler system, and with the wind blowing through the open doors, the fire quickly spread and destroyed the warehouse and its contents."

The first fire was determined to have resulted from arson, but the cause of the later fire is disputed.  Materials ignited by the first fire might have re-ignited, or the second fire might have resulted from the re-energizing of the electrical power rails following the first fire.  In any event, the Insurance Companies paid the full claim submitted by their insured for the loss of the merchandise in the warehouse, then filed this subrogation suit to recover their payments from the parties the Insurance Companies allege were actually responsible for the loss —— including the City, which the Insurance Companies insist was vicariously liable for the acts of NOFD personnel.

The Insurance Companies alleged that the NOFD's negligent actions and omissions included: (1) attempting to restore electrical power before an electrical inspection had been conducted, in violation of code and policy; (2) turning off the

4

sprinkler system without posting personnel with two-way radios at the sprinkler valves, in contravention of a specific regulation; (3) opening the large bay doors before the fire was declared out, despite wind velocities of 21 mph; (4) failing to "overhaul" any of the upper level racks even though they had been subjected to intense heat; and (5) departing the scene "under these conditions" within six minutes after declaring the fire out, without leaving adequate personnel and equipment for a fire watch.

The City filed a motion for summary judgment based on its contract with WCL, but that motion was ultimately denied in response to the Insurance Companies' motion for reconsideration. The City then filed a second motion for summary judgment, this one based on two Louisiana statutes that immunize the City and its employees from civil suits for damages based on allegations of acts negligently taken in the course of their duties: (1) R.S. 9:2798.1 (forbidding the imposition of liability on public entities or their employees when they perform policymaking or discretionary acts within the course and scope of their lawful powers and duties), and (2) R.S. 9:2793.1 (denying a cause of action against a public entity for damage caused by remedial acts reasonably taken to abate a public emergency). The district court granted this second motion for summary judgment, ruling that the City was immune from suit under R.S. 9:2798.1.[2] The district court denied the Insurance

_____

[2] The district court determined that it was "unnecessary to consider the application of public emergency immunity conferred by Section 9:2793.1," after the court decided that the firefighters' decisions were grounded in policy considerations, thus earning immunity under 9:2798.1.

5

Companies' motion for reconsideration or relief from judgment, or, in the alternative, certification of the judgment as final for immediate appeal. After all other defendants in the case were dismissed through settlement, voluntary dismissal, or summary judgment, the Insurance Companies' appeal of summary judgment in the City's favor became ripe.

## II. Analysis

### A. Standard of Review

We review a grant of summary judgment <u>de novo</u>, applying the same standard as the district court.[3] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[4] An issue is material if its resolution could affect the outcome of the action.[5] In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[6]

The standard for summary judgment mirrors that for judgment as a matter of law.[7] Thus, the court must review all of the evidence

---

[3] <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

[4] Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

[5] <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

[6] <u>See</u> <u>Olabisiomotosho v. City of Houston</u>, 185 F.3d 521, 525 (5th Cir. 1999).

[7] <u>Celotex Corp.</u>, 477 U.S. at 323.

in the record to which the parties invite the court's attention,[8] but make no credibility determinations or weigh any evidence.[9]  In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached.[10]

We also review the district court's interpretation of state statutes <u>de novo</u>, "resolving questions of Louisiana law 'the way the Louisiana Supreme Court would interpret the statute based upon prior precedent, legislation, and relevant commentary.'"[11]

## B. Discretionary Function Immunity and the <u>Berkovitz</u> Test

Article XII, Section 10 of Louisiana's Constitution provides:

> **(A) No Immunity in Contract and Tort.** Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
> ...
> **(C) Limitations....** <u>Notwithstanding Paragraph (A)...,</u> <u>the legislature by law may limit or provide for the</u> <u>extent of liability of the state, a state agency, or a</u> <u>political subdivision</u> in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. [Emphasis ours.]

---

[8] <u>See</u> <u>Skotak v. Tenneco Resins, Inc.</u>, 953 F.2d 909, 915 n.7 (5th Cir. 1992), <u>cert.</u> <u>denied</u>, 506 U.S. 832 (1992).

[9] <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000).

[10] <u>Id.</u> at 151.

[11] <u>Stephens v. Witco Corp.</u>, 198 F.3d 539, 541 (5th Cir. 1999) (quoting <u>Occidental Chemical Corp. v. Elliott</u> <u>Turbomachinery Co., Inc.</u>, 84 F.3d 172, 175 (5th Cir. 1996)).

7

The legislature did provide for a limitation of liability in R.S. 9:2798.1, which states:

> **§ 2798.1. Policymaking or discretionary acts or omissions of public entities or their officers or employees**
> A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
> B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
> C. The provisions of subsection B of this Section are not applicable:
>> (1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary function exists; or
>> (2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

Louisiana courts have noted repeatedly that the discretionary function immunity provided by R.S. 9:2798.1 is "essentially the same" as the discretionary function immunity provided within the Federal Tort Claims Act ("FTCA"), in 28 U.S.C. § 2680(a).[12] In determining whether R.S. 9:2798.1 immunity applies in a particular case, Louisiana courts turn consistently to Berkovitz v. United

---

[12] See, e.g., Fowler v. Roberts, 556 So.2d 1, 15 (La. 1989); Taylor v. City of Shreveport, 653 So.2d 232, 240 (La. App. 2d Cir. 1995); Kniepp v. City of Shreveport, 609 So.2d 1163, 1165-66 (La. App. 2d Cir. 1992); Insley v. Titan Insurance Co., 589 So.2d 10, 13 (La. App. 1st Cir. 1991).

States,[13] the U.S. Supreme Court case that established the two-step test for the applicability of § 2680(a).  Berkovitz explains the first step of the test as follows:

> "[I]t is the nature of the conduct, rather than the status of the actor that governs whether the discretionary function exception applies in a given case."  In examining the nature of the challenged conduct, <u>a court must first consider whether the action is a matter of choice for the acting employee.</u>...  [C]onduct cannot be discretionary unless it involves an element of judgment or choice....  Thus, <u>the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive.</u>  And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.[14]

If, however, there is no statutory, regulatory, or procedural policy directive dictating the employees' course of conduct, then — but only then — is the court to proceed to the second step of the test:

> [A]ssuming the challenged conduct involves an element of judgment, <u>a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield</u>.  The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of <u>legislative and administrative decisions grounded in social, economic, and political policy</u> through the medium of an action in tort."  <u>The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy.</u>[15]

---

[13] 486 U.S. 531 (1988).

[14] <u>Id.</u> at 536 (quoting <u>United States v. Varig Airlines</u>, 467 U.S. 797, 813 (1984)) (internal citations omitted) (emphasis added).

[15] <u>Id.</u> at 536-37 (quoting <u>Varig</u>, 467 U.S. at 814) (internal citations omitted) (emphasis added).

Only if the discretionary act was grounded in social, economic, or political policy, then, does the discretionary function exception immunize the public entity (or employee) from suit; otherwise the suit may go forward.

In the instant case, the district court applied the first step of the <u>Berkovitz</u> test and concluded that the firefighters' actions were not mandated by statute, regulation, or policy. The court then proceeded to the second step of the <u>Berkovitz</u> test. At that stage, the court considered the City's proffered policy reasons for the NOFD's conduct at the fire, including the propositions that the language of the City's charter "reveals [that] the need for discretion is based on competing concerns for the preservation of life and safety and the protection of private property"; that the superintendent of fires has discretion to respond to emergency situations; that in responding to emergencies, the superintendent must assign priorities to public safety and property, and face situations in which concerns for human life or safety outweigh concerns for preservation of property; and that, by implication, these were the policy considerations "animating" the firefighters' conduct at the warehouse fire. The district court rejected the Insurance Companies' argument that simply because their superiors were vested with this discretionary authority did not mean that the firefighters, working on an "operational" level, were also expressly guided by these policies. In concluding that the discretionary function immunity statute did apply, the court summarized its findings:

10

> Here, the City advances legitimate policy concerns similar to those articulated by the City of Shreveport in [Kniepp v. City of Shreveport[16]]. Plaintiffs, however, fail to raise a genuine issue of material fact that the decisions made by NOFD regarding the MacFrugal's fire are not susceptible to the policy considerations animating the broad grant of authority conferred on NOFD by the charter.... In so concluding, this Court observes that "[t]he sovereign authorities ought to be left free to exercise their discretion and choose the tactics deemed appropriate without worry over possible allegations of negligence." Therefore, the Court finds that NOFD's actions were grounded in policy.

The Insurance Companies argue that the district court erred in concluding, at the summary judgment phase of the case, that (1) the firefighters were not subject to directives, and (2) their discretionary actions were in fact grounded in policy. As explained in our de novo application of the Berkovitz test below, we agree with the Insurance Companies that there is a genuine fact question whether the firefighters' conduct was dictated by statute or fire department procedural policy. Consequently, the summary judgment stage of the litigation is simply too early to determine whether the City is entitled to discretionary function immunity under R.S. 9:2798.1.

C. Application of the Berkovitz Test

Step One: Did a statute, regulation, or policy dictate the firefighters' course of action?

The Insurance Companies contend that particular regulations and discrete NOFD fire policies dictated the procedures for the firefighters to follow at the warehouse fire, and that the

---

[16] 609 So.2d 1163 (La. App. 2d Cir. 1992).

11

firefighters violated them.  In particular, the Insurance Companies insist that the firefighters were obligated (1) to have an electrical engineer inspect the warehouse's electrical system and issue a permit before ordering the restoration of power to the warehouse; and (2) to post personnel at each of the sprinkler valves when the automatic sprinklers were deactivated and have the firefighters remain at these posts until the automatic sprinkler system was re-activated.  Differing with the district court, we conclude that the Insurance Companies have demonstrated the existence of a genuine question of material fact:  whether an ordinance or fire department procedural policy dictated the firefighters' conduct with respect to restoring power to the warehouse.  Accordingly, we need not address the question whether the firefighters' conduct with respect to the deactivation of the automatic sprinkler system may have been dictated by regulation, statute, or procedural policy.

The Insurance Companies argue that the New Orleans building code and fire department procedural policy imposed an obligation to have an electrical engineer inspect the building and to obtain a permit before the electricity could be turned on again.  The New Orleans building code applicable at the time of the fire provided that no repair or alteration of electrical equipment shall be commenced before obtaining an electrical inspection and a permit.[17]

---

[17] Article 2716 of the New Orleans Amendments to the 1994 Standard Building Code stated that "[e]very Class 'A' certificate holder proposing to install, repair or alter any electrical equipment or wires designated to carry electricity at a potential of forty-nine (49) volts or more for any purpose or service in or

12

In addition, Fire Captain Wayne Verges stated emphatically in his deposition that it is the fire department's procedural policy not to restore power:

> A. If I can reiterate, on that policy that we have, <u>it is our policy to, you know, have the electric shut off to the building. And we're not to re-energize, you know, the building without — well, we don't re-energize. NOPSI or Entergy or whatever, whoever, you know, kills the power and they restore it. Now, we'll kill the power in times of life and limb, you know, in danger, you know, prior to Entergy arriving. But as far as re-energizing, we don't</u>.
> Q. In other words, <u>as best you recall or understand standard operating procedure to be within the Fire Department, that once the electricity is eliminated to the building</u> by Energy or NOPSI, whichever, —
> A. Uh-huh (affirmatively).
> Q. — <u>the Fire Department normally would not ask Entergy to restore power</u>? Is that what you're telling me?
> A. <u>Correct</u>.
> Q. And the reason for that policy is both for the safety of the firemen who may be inside the building, correct? That's one reason?
> A. Uh-huh (affirmatively).
> Q. Correct?
> A. Correct.
> Q. And secondly is that the Fire Department doesn't know what damage may have been sustained by the electrical system during the fire. Correct?
> A. Correct.
> [Emphasis ours.]

The likelihood that this was the fire department's procedural policy is further strengthened by the deposition testimony of Larry

---

on any building or premises, shall file an application for a permit with the Electrical Inspection Bureau of the Department of Safety and Permits.... No work may be commenced until the permit application is approved and the acceptance is acknowledged by the Electrical Inspection Bureau, except when failure to commence the work would be life threatening or the work is an emergency due to a disaster or any uncontrolled event or occurrence."

Chan, the City's Chief Electrical Inspector, which was offered by the Insurance Companies in support of their position:

> Q. <u>If power was terminated to that facility on the morning of the fire at the request of the Fire Department and Entergy in fact turned off the power, is the normal practice or the proper practice that prior to the facility being reenergized [sic], that your department has to go to that facility to give its approval before Entergy can re-energize the property</u>?
>
> A. <u>I would say that's the normal practice</u>.
>
> Q. Okay. Normal practice. Is there any type of codal requirement imposed by the City with respect to re-energizing a property after the power to the facility has been turned off as a result of a fire?
>
> A. As I say, a normal practice is that it goes through Department of Safety and Permits, the Electrical Division. I don't know if any other agencies has [sic] the right or not to do the same.
>
> Q. So you don't know if the Fire Department has the right to tell the utility company to turn on and off the power? Is that what you're saying?
>
> A. Correct.
>
> Q. <u>If I were to tell you that the Fire Department instructed that the power be turned off and then turned back on again at those times that I mentioned earlier, and if there was no one from your department there, that would not be, to use your words, the normal practice. Is that correct?</u>
>
> A. <u>Correct. They normally order it off, but I — I am not aware of them putting it back on</u>.
>
> Q. <u>What is the reason why you follow the normal practice</u> or what is the rationale for the normal practice?
>
> A. Well, in our department, I mean throughout the years, I mean, <u>as chief I just picked up from practices that have been done, but it's not just a practice. The fact is that when power is off, they are required to make an inspection to make sure it's safe to re-energize it</u>. And when you file a permit application, that's got to come through us and we're the ones that have to approve it to Entergy.
>
> [Emphasis ours.]

In the face of these clear mandates from the building code and long-established NOFD policy, continues the argument of the Insurance Companies, NOFD firefighters ordered the power restored

14

without the requisite inspection, after they had ordered it turned off in the first place.

With respect to the building code provision, the parties disagree whether it applies during fire emergencies (the City contends that it does not) and whether a fire emergency continued to exist by the time that attempts were made to re-energize the building (the City contends that there was). As for the NOFD policy, the City challenges Chan's deposition testimony by pointing to other excerpts and arguing that Chan actually did not know how a situation involving the NOFD's re-energizing of a building should be handled. As the Insurance Companies note, however, the City's contention is pregnant with its failure to address the testimony of Captain Verges at all.

From the foregoing we conclude that the parties have joined on at least three genuine issues of material fact: (1) Did the building code provision that requires a permit before restoring power to a building apply in fire emergencies; (2) was there still a fire emergency at the time attempts were made to re-energize the building; and (3) regardless of whether the ordinance applied, was it NOFD policy to refrain from restoring power after having it turned off during fire-suppression efforts. This, coupled with the fact that at least one theory of the second fire's rekindling implicates the re-energizing of the building, forces us to conclude that the district court erred when it determined at the summary judgment stage that the firefighters' conduct was not dictated by statute, regulation, or policy.

15

As the Berkovitz Court explained, the discretionary function exception applies only when a court determines that (1) a statute, regulation, or policy did not dictate the actor's conduct, and (2) the actor's conduct was grounded in social, economic or public policy. The Insurance Companies have demonstrated the existence of a genuine issue of material fact with respect to the first step of the Berkovitz inquiry. At this preliminary summary judgment phase of this lawsuit, therefore, the district court cannot advance to the second step of the Berkovitz test, and the City cannot be afforded the immunity provided by R.S. 9:2798.1.[18] Accordingly, we reverse the district court's summary judgment and remand the case for further proceedings consistent with this opinion.[19]

REVERSED and REMANDED.

---

[18] Denial of immunity under R.S. 9:2798.1 at the summary judgment stage of this litigation does not, however, preclude the possibility that the City could yet be found to be immune under this statute after a complete finding of facts.

[19] As we observed in note 2, supra, the district court declined to reach the question whether the public emergency immunity conferred by R.S. 9:2793.1 might apply, when it granted summary judgment in the City's favor based on R.S. 9:2798.1. We express no opinion about whether R.S. 9:2793 may yet be found to protect the City from suit or liability when further proceedings are had in the district court.