# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 18-30968

—————

United States Court of Appeals
Fifth Circuit

**FILED**

September 13, 2019

Lyle W. Cayce
Clerk

PAUL A. CLEVELAND; PARIS LEBLANC; MINDY CAPELLO,

>   Plaintiffs-Appellees,

v.

LILLIAN BELL,

>   Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Middle District of Louisiana

————————————

Before SOUTHWICK, WILLETT, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

Paul Cleveland's survivors sued a prison nurse named Lillian Bell under 42 U.S.C. § 1983 for allegedly violating his Fourteenth Amendment rights. The district court denied qualified immunity to Nurse Bell. We reverse.

I.

Paul Cleveland was seventy-two years old when he was detained at the East Baton Rouge Parish Prison on September 19, 2014. Upon entering the Prison, Cleveland completed a health assessment. According to the assessment, Cleveland had a host of health problems, including diabetes, high blood pressure, rheumatoid arthritis, and peripheral artery disease. During his two months at the Prison, Cleveland received medication for his conditions

and had numerous visits with medical staff regarding a variety of health issues.

On the morning of November 10th, Cleveland received emergency medical treatment after he became dizzy and nauseated in the bathroom and fainted. Nurse Ebony White checked his vital signs, treated him for a cut on the back of his head, and put him on a list to see the next available doctor. In the late afternoon, Cleveland said he was "going to pass out." Nurse White visited Cleveland, and Cleveland said he felt dizzy when sitting up or walking long distances. Cleveland demanded to go to the hospital for evaluation and said he wanted "pain medication to knock him out." He reported no chest pains or shortness of breath. Nurse White told Cleveland that he did not exhibit any signs of acute distress, so he would not be sent to the emergency room. Instead, Cleveland would be placed on the list to see the next available doctor for further evaluation.

The nurses brought Cleveland back to the "medical tank," where patients with health issues are kept for observation by medical staff. Nurse White wrote in her notes that Cleveland was "very argumentative" while he was in the medical tank and was banging on the windows. Cleveland was eventually moved from the medical tank to a single cell.

On November 11th, at around 5:54 p.m., Nurse Bell went with Officer Richard Camp to Cleveland's cell to give him his medication. Cleveland was lying in bed, and Nurse Bell told him to get a cup of water so he could take his pills. Cleveland said that he was too weak to get up. Nurse Bell told Cleveland "to stop playing and come get your medication . . . there is nothing wrong with you." But Cleveland said that he couldn't get up. Nurse Bell left and said she would come back after completing her "pill call" with the other inmates.

Around 8:42 p.m., Nurse Bell returned and asked Officer Camp how Cleveland was doing. Camp said he "seems to be sleeping" but had been

turning around in his bed and occasionally hit the wall with his fist. Nurse Bell said "okay" and returned to the medical department. Her notes in Cleveland's medical chart indicate that she completed a high-priority "[l]ockdown/trusty sick call" at 11:53 p.m. But to Officer Camp's knowledge, Nurse Bell did not visit Cleveland again to give him his medicine.

At around 2:32 a.m. on November 12th, Officer Camp saw that Cleveland had defecated on himself and his mattress. Officer Camp called Officers Jasmyn Cage and Larry Turner to supervise the cleanup of Cleveland and his cell. The officers told Cleveland to "get up off the floor and come to the bars to be handcuffed so that his cell could be cleaned out." But Cleveland continued to lie on the floor and said that he was "tired." The officers entered Cleveland's cell, removed his dirty mattress and jumpsuit, and allowed staff to clean his cell. Cleveland received a clean jumpsuit, but he declined a chance to use the shower.

During the cleanup, Officer Cage called Nurse Bell. Officer Cage told her that Cleveland was lying "on the floor and talking about [how] he was tired and he couldn't get up." Nurse Bell said she thought he was "faking" and was "trying to get back in the infirmary."

After the call, Officer Camp continued to make his rounds in the Prison. According to his written report, every time he passed by Cleveland's cell, Cleveland "would rollover [sic] or move." If he did not see Cleveland move, he would talk to Cleveland. Officer Camp didn't hold a conversation with Cleveland but would call his name and make sure "he either moved or every now and then . . . would answer." Officer Camp paid "extra attention to Mr. Cleveland because of what had occurred." A deputy had advised Officer Camp to keep an eye on Cleveland because Cleveland had just come back from the medical department.

3

No. 18-30968

At 4:05 a.m. on November 12th, Officer Camp passed out food to inmates. As he gave the inmates their trays, he made sure they were awake. When Officer Camp went to Cleveland's cell, he noticed Cleveland was unresponsive. He had seen Cleveland just five or ten minutes earlier. Cleveland had no pulse, and attempts to resuscitate him proved unsuccessful.

Cleveland's survivors sued a bevy of medical professionals and law-enforcement officers under 42 U.S.C. § 1983 and various other provisions of law. The district court granted summary judgment to all defendants except Nurse Bell. It refused to grant Nurse Bell qualified immunity from a claim alleging deliberate indifference to Cleveland's medical needs. Nurse Bell timely appealed.

II.

"Qualified immunity is an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quotation omitted). "[I]t protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted). "[O]nce properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quotation omitted).

To negate qualified immunity, the plaintiff must make two showings. First, the plaintiff must show the defendant violated his constitutional rights. *Pearson*, 555 U.S. at 232. Second, the plaintiff must show the asserted right was clearly established at the time of the alleged misconduct. *Ibid.* If the plaintiff fails at either step, the federal court can grant qualified immunity by addressing either step or both of them. *See id.* at 236; *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

The Supreme Court has said the Eighth Amendment prohibits "deliberate indifference" to a prisoner's medical needs. *Farmer v. Brennan*, 511

4

No. 18-30968

U.S. 825, 834–47 (1994).  And we've held the same rule applies to pretrial detainees like Cleveland under the Fourteenth Amendment.  *Hare v. City of Corinth*, 74 F.3d 633, 648–49 (5th Cir. 1996) (en banc).

To establish a constitutional violation, a plaintiff must show that the defendant: (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) subjectively "dr[e]w the inference" that the risk existed; and (3) disregarded the risk.  *Farmer*, 511 U.S. at 837.  In describing the second element, the Supreme Court has emphasized that a "prison official cannot be found liable" unless she "knows of" an excessive risk to inmate health or safety.  *Ibid.*  A failure to act "unaccompanied by knowledge of a significant risk of harm" is insufficient to establish a constitutional violation.  *Id.* at 837–38.  It is not enough to identify a significant risk that the official "should have perceived but did not."  *Id.* at 838.

In this case, the district court failed to provide any analysis of why it denied qualified immunity to Nurse Bell.  Instead, it gave a one-sentence conclusory statement:  "Taking the facts in the light most favorable to Plaintiffs permits a conclusion that, on the night before and morning of Cleveland's death, she acted with deliberate indifference to Cleveland's welfare."  *Cleveland v. Gautreaux*, 2018 WL 3966269, at *16 (M.D. La. Aug. 17, 2018).  The court did not identify which facts showed that Nurse Bell: (1) was aware of information that could lead to the inference that Cleveland was experiencing a life-threatening medical emergency; (2) drew the inference and was subjectively aware of how serious the situation was; and (3) disregarded Cleveland's life-threatening medical emergency, despite appreciating its existence.

When the district court fails to identify which facts it relied on, we must review the entire record to determine "what facts the district court, in the light most favorable to the nonmoving party, likely assumed."  *Johnson v. Jones*,

No. 18-30968

515 U.S. 304, 319 (1995).   We then review *de novo* the district court's application of the law to those facts.  *Hare*, 135 F.3d at 325.

Having reviewed the record, we find no evidence that on November 11th or 12th, Nurse Bell subjectively "dr[e]w the inference" that Cleveland was experiencing a life-threatening medical emergency.  *Farmer*, 511 U.S. at 837. The record contains statements from Nurse Bell indicating that she thought there was nothing wrong with Cleveland and believed he was faking illness. But nothing suggests that these statements reflected anything other than her sincere opinion at the time.  Even if we construe her statements in the light most favorable to Plaintiffs, they are insufficient to establish that Nurse Bell knew how serious the situation was.  The Supreme Court has made clear that actual knowledge is an essential element of Plaintiffs' burden, as mere negligence cannot establish a constitutional violation.  *Id.* at 835–38.  Given the lack of evidence about Nurse Bell's subjective awareness of a substantial risk of serious harm to Cleveland, Plaintiffs cannot show a constitutional violation at step one of the qualified-immunity analysis.

Plaintiffs have also failed to show a potential violation of clearly established law at step two.  The Supreme Court has repeatedly told us "not to define clearly established law at a high level of generality."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quotation omitted).  The dispositive question in this step of the qualified-immunity analysis is "whether the violative nature of *particular* conduct is clearly established."  *Ibid.* (quoting *al-Kidd*, 563 U.S. at 742).  Cases that are "too factually distinct to speak clearly to the specific circumstances here" are not enough to deny qualified immunity. *Id.* at 312.

The district court relied on two of our decisions for the applicable clearly established law.  *See Cleveland*, 2018 WL 3966269, at *16 (citing *McCormick v. Stalder*, 105 F.3d 1059 (5th Cir. 1997), and *Fielder v. Bosshard*, 590 F.2d

6

No. 18-30968

105 (5th Cir. 1979)).  We assume without deciding that our precedent could, in an appropriate case, clearly establish the law.  *See, e.g.*, *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (per curiam) (summarily reversing the Third Circuit for relying on circuit precedent to deny qualified immunity, but "[a]ssuming for the sake of argument that a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals").  Even so, *McCormick* does not fit the bill.  That case held that the plaintiff's constitutional claim regarding tuberculosis treatment was "properly dismissed as frivolous." *McCormick*, 105 F.3d at 1062.  *McCormick* does not clearly establish anything.

And this case is much different from *Fielder*.  While in jail, Fielder began to experience hallucinations, behave erratically, and shake physically.  *Fielder*, 590 F.2d at 108.  Ten hours after these symptoms began, he said:  "Help me.  I need a doctor."  *Ibid.*  Jail staff never brought him to a medical professional, and he was found dead in his cell at 7 a.m. the next day.  *Ibid.*  Here, by contrast, Cleveland received emergency medical attention two days before he died.  The decision not to hospitalize him after he fainted on November 10th was based on a different nurse's medical judgment after she examined Cleveland.  Nurse Bell's involvement began only on November 11th.  That night, she tried to give Cleveland his medication, but he refused it.  A few hours later, she returned to check up on Cleveland but decided not to visit him after being told that he seemed to be sleeping.  As we noted in *Fielder*, there "is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner" and deliberate indifference.  *Ibid.*  *Fielder*'s very different facts could not put Nurse Bell on "fair notice" that she was acting unconstitutionally. *Mullenix*, 136 S. Ct. at 314 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Our Court has previously held that a "record of extensive medical treatment spanning the final two and one half months" of an inmate's incarceration—combined with "the lack of evidence to establish the necessary

culpable intent"—was sufficient for qualified immunity. *Gobert v. Caldwell*, 463 F.3d 339, 351–52 (5th Cir. 2006). Cleveland's case is closer to *Gobert* than to *Fielder*. Nurse Bell is therefore entitled to qualified immunity.

\* \* \*

The district court's denial of summary judgment to Nurse Bell is REVERSED.