# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 6, 2023

Lyle W. Cayce
Clerk

No. 22-30220

Mallory Addington; Landon Addington,

*Plaintiffs—Appellees*,

*versus*

Damion Wells, *Sergeant*,

*Defendant—Appellant*,

_____

Cody Lane Addington,

*Plaintiff—Appellee*,

*versus*

Damion Wells, *Sergeant*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC Nos. 5:18-CV-1116 and 5:19-CV-411

Before Richman, *Chief Judge*, and King and Higginson, *Circuit Judges*.

Per Curiam:[*]

Joshua Addington, a diabetic, died in custody. His children brought constitutional and tort claims against various prison officials, including Defendant-Appellant Damion Wells. Wells appeals the district court's denial of his qualified immunity defense as to the constitutional claims and the denial of his Louisiana state discretionary immunity defense as to the negligence claim. We REVERSE.

**I.**

On April 1, 2018, Joshua Addington[1] died while incarcerated in the Bayou Dorcheat Correctional Center ("BDCC"). His children brought this suit against Defendant-Appellant Sergeant Damion Wells, BDCC, and other prison and state officials.

Addington had Type II diabetes, a condition affecting his ability to regulate blood sugar levels. He had been diabetic for about ten years at the time of his death, during which he had been frequently diagnosed with conditions arising from extreme blood sugar levels. Like many diabetics, Addington used insulin and food to manage his blood sugar.

Diabetics are vulnerable to both hyperglycemia (high blood sugar) and hypoglycemia (low blood sugar). *Manage Blood Sugar*, CDC, https://www.cdc.gov/diabetes/managing/manage-blood-sugar.html [hereinafter "*Manage Blood Sugar*"] (last visited Feb. 27, 2023). Diabetics often manage blood sugar levels by injecting insulin to lower blood sugar and eating to raise blood sugar. *See id.* Blood sugar levels outside of a normal range can cause severe consequences. A lack of insulin can cause hyperglycemia and make diabetics tired, thirsty, or nauseous; in extreme cases, low insulin

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] Unless otherwise differentiated, we use "Addington" to refer to both the deceased, Joshua Addington, and the Plaintiffs-Appellees, his children.

can cause a diabetic ketoacidosis ("DKA")-induced coma or death. *See Diabetic Ketoacidosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/symptoms-causes/syc-20371551 (last visited Feb. 27, 2023); *Manage Blood Sugar*. Analogously, hypoglycemia can be triggered by too much insulin or missing a meal. *See Manage Blood Sugar*.

On March 17, 2018, Addington arrived at BDCC. As relevant, three events coincided with this arrival. First, on his intake health screening, Addington reported that he had Type II diabetes and that he had no history of alcohol abuse, drug abuse, or hospitalizations of which BDCC staff needed to be aware. Second, BDCC received a medical transfer form noting that Addington was prescribed insulin shots to be administered twice per day. Third, Addington signed a form indicating he had read the explanation of how to request medical attention. Generally, while Addington was incarcerated, a diabetic inmate had to proactively seek blood sugar readings and insulin shots. If a shot was needed based on the reading, an officer would observe the inmate self-administering the shot and report and record both the reading and, if applicable, the shot.

On March 21, Addington suffered a mild hypoglycemic event. His blood sugar level was 58, and he subsequently used a medical evaluation form to request a diabetic snack.

On March 30, Addington suffered a significant hypoglycemic event. He received treatment at Minden Medical Center ("Minden") for hypoglycemia. Minden discharged Addington with instructions to follow up as needed with a private physician; discharge papers also listed critical glucose levels as being below 50 or above 400 mg/dL (milligrams per deciliter: a unit of measure showing concentration of glucose). These discharge papers were later given to Sergeant Wells. When Addington

returned to BDCC, he was placed in a separate holding cell for continuous medical observation. This cell contained live-feed cameras and a buzzer that an inmate can use to alert officers of any medical needs. Addington's blood sugar reading was 175 on the afternoon of March 30; approximately two hours later, his temperature was 101.2 degrees Fahrenheit.

On March 31, Addington received medication for nausea. Multiple people took Addington's blood sugar levels that day, and Wells prepared an Unusual Occurrence Report (the "UOR") listing Addington's blood sugar levels and "letting everybody to understand [*sic*] that this is where [Addington] was during these particular times throughout the day"; these levels were higher than on the previous day, ranging from 274 to 364 mg/dL. Wells also stated that he believed the normal blood sugar level for a diabetic "shouldn't be over 100" and that he would have notified medical staff with a "crazy" reading of "500 or something." Warden John Lewis said that it was "common sense" to him that the blood sugar levels recorded in the UOR were abnormal.

Addington's condition deteriorated rapidly on April 1. At 6:15 a.m., he was responsive, moving, and talking when Deputy Wendell Wright came into the holding cell to check Addington's blood sugar levels. Addington asked Wright for some water, which Wright provided. At 9:30 a.m., Deputy Nolan Slack brought Addington a food tray, which Addington refused. At 1:21 p.m., Deputy David Edwards went to the holding cell to check on Addington's blood sugar levels. Addington was unresponsive and not moving; Edwards and another deputy moved Addington upright and saw that he had soiled himself. The deputies alerted Wells at 1:33 p.m., an ambulance was called at 1:38 p.m., and Addington was pronounced dead at 1:55 p.m. An autopsy found no evidence of trauma and listed the cause of death as acute renal failure due to DKA complicating hypertensive cardiovascular disease.

No. 22-30220

On August 29, 2018, Plaintiffs-Appellees Mallory and Landon Addington—Joshua Addington's children—filed a complaint against, *inter alia*, various state and prison officials in their individual and official capacities.[2] Following discovery responses and a motion by certain Defendants for summary judgment, the magistrate judge granted Addington's motion to amend his complaint to join Wells, Debbie Claunch (a BDCC nurse), and Dr. Frederick Heard (a BDCC doctor) as additional parties.

On July 8, 2020, Addington filed the operative amended complaint incorporating the allegations of the previous complaint. In the amended complaint, as relevant to this appeal, Addington additionally alleged that various doctors, nurses, and prison officials (including Wells) violated the Eighth Amendment by acting with deliberate indifference in failing to ensure that Addington received proper medical care. In their answer, Defendants Wells, Claunch, Warden John Lewis, and Sheriff Gary Sexton raised a qualified immunity defense.

These Defendants then filed a motion for summary judgment. There, they argued, *inter alia*, that they were entitled to qualified immunity as to the individual-capacity claims. On the Louisiana state law claims, they raised a state discretionary immunity defense and argued that they acted reasonably and did not cause Addington's death.

On March 31, 2022, the district court ruled on Defendants' motion for summary judgment. As relevant to this appeal, the court first denied this motion as to the Eighth Amendment individual-capacity claim that Wells was

---

[2] In June, the magistrate judge consolidated a substantively identical case brought by Cody Addington, another of Joshua Addington's children.

deliberately indifferent in handling Addington's medical complaints after the March 30 Minden discharge.

Considering the first prong of the qualified immunity analysis (*i.e.*, whether there was a violation of a constitutional right) the district court ruled that there was a genuine dispute of material fact precluding summary judgment as to whether Wells had the necessary culpable state of mind to constitute deliberate indifference when he disregarded and did not mitigate the risk of harm caused by Addington's elevated blood sugar levels. Specifically, the district court noted that Wells had created the UOR documenting elevated blood sugar levels without conveying his concerns to Nurse Claunch or Dr. Heard and without giving any insulin to Addington. Wells additionally did not take any action when Addington complained of nausea and thirst, both of which are symptoms of DKA. Given these facts, the district court held that "a jury could reasonably conclude that Sergeant Wells chose not to take any action to alleviate the risk, such as contacting medical personnel or ensuring that Addington's insulin was administered," which would constitute deliberate indifference to Addington's medical needs.

On the second prong of the qualified immunity analysis (*i.e.*, whether the right in question was clearly established), the court denied Wells qualified immunity by "conclud[ing] that an inmate's right to adequate medical care was clearly established at the time of this incident and that prison officials were on notice that they cannot show a wanton disregard to an inmate in obvious medical need."

Finally, on the state law negligence claim, the district court denied summary judgment as to Wells for the same reasons stated in its analysis of the Eighth Amendment claims. Wells timely appealed.

No. 22-30220

## II.

We have limited jurisdiction over an interlocutory appeal of a denial of summary judgment based upon qualified immunity. *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc). Our jurisdiction is limited "to the extent that [the denial of summary judgment] turns on an issue of law." *Hogan v. Cunningham*, 722 F.3d 725, 730 (5th Cir. 2013) (alteration in original) (quoting *Juarez v. Aguilar*, 666 F.3d 325, 331 (5th Cir. 2011)). Thus, our jurisdiction does not extend to the review of the lower court's factual findings. *Lemoine v. New Horizons Ranch & Ctr., Inc.*, 174 F.3d 629, 633 (5th Cir. 1999). "Once we have narrowed the interlocutory appeal solely to issues of law, we review the district court's resolution of these issues de novo." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009).

In qualified immunity cases, "[t]he plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020). "But, to overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Id.* Accordingly, a court reviews a motion for summary judgment based on qualified immunity in two steps. "First: 'Taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right.'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "Second, we ask 'whether the right in question was "clearly established" at the time of the violation.'" *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). We can review these steps in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

No. 22-30220

## III.

Our discussion of Wells's qualified immunity defense begins and ends with the second step. We consider whether Addington has identified an analogous case showing that Wells's conduct in not administering medical attention in this case is conduct that violates clearly established law. *See Dyer v. Hous.*, 964 F.3d 374, 384 (5th Cir. 2020) (explaining the level of detail at which plaintiff must define clearly established law); *see also Joseph*, 981 F.3d at 338 (explaining that identified cases must prohibit the "challenged conduct" of a defendant acting under similar circumstances). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). We hold that Addington has not. Accordingly, we need not consider whether Wells's actions rise to the level of a constitutional violation.

Addington cites four cases as possible sources of clearly established law: *Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001); *Dyer*, 964 F.3d 374; *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979); and *Estelle v. Gamble*, 429 U.S. 97 (1976). But these cases involve facts that are materially distinguishable from the present circumstances. *Thompson* involved a jail sergeant who was aware that Thompson, an inmate, had elevated blood alcohol content, was "hallucinating," and "was injuring himself in his cell." 245 F.3d at 452, 463. The sergeant specifically knew Thompson had "beg[u]n to collide with objects in his cell, sometimes falling and striking his head against the window, floor or concrete bench of his cell." *Id.* at 454. *Dyer* involved officers who watched Dyer repeatedly bang his head approximately 46 times against the inside of a patrol car en route to the prison but did not alert any prison staff to Dyer's behavior. 964 F.3d at 378–79. And *Fielder*

8

involved an inmate who had requested medication and was hallucinating and physically shaking. 590 F.2d at 108. Concerning *Estelle*, 429 U.S. 97, we held on remand that the actions of the prison officials overseeing the inmate's treatment did not constitute deliberate indifference; accordingly, it cannot serve as a source of clearly established law. *Gamble v. Estelle*, 554 F.2d 653, 654 (5th Cir. 1977) (per curiam).

These cases are inapposite here because their facts all involve some combination of a specific request for medical attention that was ignored by jail staff (*Fielder*) or circumstances involving obvious and externally visible injuries (*Thompson*, *Dyer*, and *Fielder*). The present facts are materially different. Addington did not explicitly request medical attention, and Wells thus did not ignore his requests. And while elevated blood sugar levels are exceptionally dangerous for diabetics, they are not as obvious and externally visible as the injuries in *Thompson*, *Dyer*, and *Fielder*.

A more factually analogous case is *Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019). *Cleveland* involved a plaintiff who had various health problems logged at his initial prison health assessment. *Id.* at 674. Over the two months he spent at the prison, "Cleveland received medication for his conditions and had numerous visits with medical staff regarding a variety of health issues." *Id.* A nurse, Bell, "told [Cleveland] to get a cup of water so he could take his pills" and, upon Cleveland saying he was too weak to get the cup, told him "to stop playing and come get your medication . . . there is nothing wrong with you." *Id.* Bell said she would return; upon returning, she asked an officer how Cleveland was doing. *Id.* at 674–75. The officer told Bell that Cleveland was seemingly sleeping but that he "had been turning around in his bed and occasionally hit the wall with his fist." *Id.* at 675. Bell did not return to Cleveland to give him his medication. *Id.* Later, officers found that Cleveland had defecated on himself and called Bell explaining that Cleveland was lying on the floor claiming he could not get up from exhaustion. *Id.* Bell said she

thought Cleveland was faking and trying to get transferred back to the infirmary. *Id.* Cleveland was found dead a few hours later. *Id.*

The *Cleveland* court, considering the second prong of Bell's qualified immunity defense, distinguished its case from *Fielder*. *Id.* at 677. In *Fielder*, the namesake plaintiff was arrested and taken to jail. 590 F.2d at 107. In jail, Fielder was sick and began to hallucinate, physically shake, and climb the bars. *Id.* at 108. Prison officials nonetheless denied Fielder's request for medical attention. *Id.* The sheriff was notified of Fielder's behavior and only asked a deputy to check on Fielder. *Id.* The next morning, Fielder was found dead. *Id.* The jury found that the named prison officials had been deliberately indifferent to Fielder's medical needs; on appeal, this court affirmed the judgment. *Id.* at 107–09.

While jail staff never brought Fielder to a medical professional, the *Cleveland* court noted that, by contrast, "Cleveland received emergency medical attention two days before he died" and that "[t]he decision not to hospitalize him after he fainted on November 10th was based on a different nurse's medical judgment after she examined Cleveland" before Bell became involved in Cleveland's care. 938 F.3d at 677. Bell's behavior, the *Cleveland* court held, was thus "very different" from the staff in *Fielder* who ignored an inmate's requests. *Id.* As a result, the "'record of extensive medical treatment spanning the final two and one half months' of an inmate's incarceration—combined with 'the lack of evidence to establish the necessary culpable intent'—was sufficient for qualified immunity." *Id.* (quoting *Gobert v. Caldwell*, 463 F.3d 339, 351–52 (5th Cir. 2006)).

The facts in *Cleveland* are analogous to the present events; accordingly, our analysis in that case guides our decision here. Like Cleveland, Addington received medical treatment in the days before his death. And, like in *Cleveland* and unlike in *Fielder*, Addington never made an

No. 22-30220

explicit request for medical treatment that was ignored by the prison staff. In sum, Addington's proffered sources of clearly established law involve materially different facts, and our holding in *Cleveland* shows that an officer acting under similar circumstances does not violate clearly established law. Accordingly, we cannot say that Addington has met his burden of placing "beyond debate" the question of whether an officer acting under similar circumstances would have been on notice that he was violating clearly established law. *al-Kidd*, 563 U.S. at 741. We thus reverse the judgment of the district court on this prong of the qualified immunity analysis without reaching the question of whether Wells's actions constituted a constitutional violation.[3]

## IV.

We now turn to the Louisiana state immunity claim, which we have jurisdiction to review *de novo*. *See Morin v. Caire*, 77 F.3d 116, 119–20 (5th Cir. 1996) (noting our jurisdiction over state law claims related to a qualified immunity appeal); *cf. Vann v. City of Southaven*, 884 F.3d 307, 309 (5th Cir. 2018) (per curiam) (identifying the standard of review for legal issues on a motion for summary judgment on the basis of qualified immunity). The relevant Louisiana immunity statute immunizes public entities and their officers and employees from tort claims based on "policymaking or discretionary acts when such acts are within the course and scope of . . . lawful powers and duties." *Gregor v. Argenot Great Cent. Ins. Co.*, 851 So. 2d 959, 967 (La. 2003) (quoting LA. STAT. ANN. § 9:2798.1(B)).

---

[3] For clarity, our holding here should not be imputed to an analysis of the first prong; in other words, we are not holding that deliberate indifference arising to a constitutional violation must always require an explicit request for medical attention or involve obvious and externally visible injuries. We are concerned only with the narrow question of whether the cases discussed by Addington and the district court show that Wells's conduct under these specific facts violated clearly established law.

11

Louisiana courts have interpreted this immunity in line with the discretionary function immunity provided by the Federal Tort Claims Act. *Com. and Indus. Ins. Co. v. Grinnell Corp.*, 280 F.3d 566, 571 (5th Cir. 2002). Louisiana courts apply the two-step test outlined in *Berkovitz v. United States*, 486 U.S. 531 (1988), to determine if this state immunity applies:

> First, if a statute, regulation, or policy prescribes a particular course of action, there is no choice or discretion involved, and the immunity does not apply. However, when discretion is involved, the court must then determine whether that discretion is the kind that is shielded by the statutory immunity, that is, discretion grounded in social, economic or political policy.

*Aucoin v. Larpenter*, 324 So. 3d 626, 637–38 (La. Ct. App. 2021); *Com. and Indus. Ins. Co.*, 280 F.3d at 571.

We first consider whether a policy prescribed a particular action for Wells. BDCC's general policy regarding inmates' medical care provides guidelines for corrections officers; these guidelines state that doctors' instructions dictate treatment and that officers should report medical problems to the medical officer. There are no further details beyond these general requirements in the absence of a request for medical care by the inmate. Accordingly, we read the policy as allowing officers to, for example, determine what is and is not a medical problem requiring a report. This involves discretion. *See Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005) (stating that an action is policy-based if it "involves selection among alternatives"); *see also Rombach v. Culpepper*, 2021 WL 2944809, at *9 (5th Cir. July 13, 2021) (per curiam) (holding that "the officers' decisions to provide (or not to provide) certain care to [plaintiff] were ultimately the result of their discretion"); *Aucoin*, 324 So. 3d at 638 (holding that a state regulation requiring a licensed physician to be "responsible for the health

care program" at a parish jail involved discretion concerning "the manner in which that care was administered and provided"). Accordingly, we proceed to the second step.

We next consider whether this discretionary conduct at issue falls within the general protections of the statute or is excluded by an exception. This "is purely a question of law[] and is within the province of the trial court to determine at the summary judgment stage." *Simmons v. Hughes*, 316 So. 3d 488, 497 (La. Ct. App. 2020); *see also Rombach*, 2021 WL 2944809, at *9 (applying this framework). Here, the relevant question is whether Wells's conduct falls within the intentional misconduct exception to this state immunity statue. *See* LA. STAT. ANN. § 9:2798.1(C)(2). In considering this question, we ask whether Addington "put forth evidence showing that the conduct of the defendants rose to the level of misconduct required by" the exception to the immunity statute; in other words, "whether the defendants' actions constituted 'criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.'" *Simmons*, 316 So. 3d at 497, 500 (quoting LA. STAT. ANN. § 9:2798.1(C)(2)).

Addington argues that Wells was deliberately indifferent for purposes of the qualified immunity analysis and that Wells's conduct thus rises to the requisite level of intentionality required to obviate the Louisiana state immunity's protections.[4] Addington argues the following events evince Wells's "requisite knowledge and perception" that Addington "faced a substantial risk to his health": (1) Addington's March 30 transfer to a medical observation cell after his discharge from Minden; (2) Addington's fever on

---

[4] We consider these arguments here only in the context of evaluating the Louisiana state immunity claim. As noted previously, we do not reach the issue of whether Wells's conduct meets the "deliberate indifference" standard for qualified immunity purposes, and our analysis here thus has no bearing on this issue. *See supra* note 3.

March 30; (3) Addington's March 31 complaint of nausea; (4) Wells's March 31 completion of the UOR showing elevated blood sugar levels; and (5) Wells's alleged failure to give Addington insulin on March 31 and April 1. In light of these events, Addington argues that Wells's failure to seek medical attention for Addington indicates he was acting with the requisite level of intentionality.

We disagree and hold that Wells's conduct does not constitute the requisite level of intentional misconduct that would take him outside the protections of section 9:2798.1's immunity provisions. Louisiana courts presume that "when government employees exercise discretion given to them by a statute or regulation, they are doing so based on the same policy concerns that animate the controlling statute or regulation itself." *Dominique v. Parish*, 313 So. 3d 307, 316 (La. Ct. App. 2020) (citing *Louisiana v. Pub. Invs., Inc.*, 35 F.3d 216, 221 (5th Cir. 1994)). Addington has not successfully rebutted this presumption. As an initial matter, most of the events Addington cites are not sufficient to establish intentional misconduct on Wells's part.[5] Concerning Wells's alleged failure to give Addington insulin, the record indicates that Addington knew how to request medical attention. No record evidence suggests that Addington requested (but did not receive) insulin on the day of his death, much less that Wells knew of but failed to complete such a request. Without more, this is not enough to establish the requisite degree of intentional misconduct on the part of Wells.

---

[5] Concerning Addington's transfer to a medical observation cell, this transfer suggests only that further observation was appropriate, not that the immediate notification of medical personnel was necessary. Regarding Addington's fever, as noted by the district court, "there is no evidence that the fever was such a concern to require immediate medical care other than further observation." And with respect to Addington's nausea, Addington received medication for this ailment, after which there would presumably have been a reduced need for additional medical concern. .

Wells's filling out the UOR requires a more sustained discussion. In making this argument, Addington essentially asks us to hold that a medically untrained official filling out a UOR constitutes evidence of intentional or reckless conduct. We decline to do so under these facts. In his deposition, Wells indicated that he believed the normal blood sugar level for a diabetic "shouldn't be over 100" and that he would have notified medical staff with a "crazy" reading of "500 or something." His testimony thus suggests that Wells thought of blood sugar levels over 100 mg/dL as unusual and levels over 500 mg/dL as requiring medical attention. This latter range is mostly consistent with Addington's discharge papers from Minden, which flagged below 50 or above 400 mg/dL as extreme blood sugar levels.

But notably, the blood sugar levels recorded by Wells in the UOR ranged from 274 to 364 mg/dL; these levels were not within the extreme ranges identified in the Minden discharge papers or the "crazy" ranges understood by Wells as requiring medical attention. Accordingly, Wells's filling out the UOR suggests that he thought these blood sugar readings were unusual but not so concerning as to require immediate medical attention. Addington's argument essentially asks us to eliminate this distinction by holding that filling out a UOR without requesting immediate medical attention evinces intentional misconduct. We will not do so here, where a medically untrained official was merely noting unusual events while abiding by Minden's discharge instructions. Wells's decision to not seek medical attention for Addington after this UOR is better characterized as a kind of "policy-based discretion," *Roberts*, 397 F.3d at 296, where Wells, looking to the discharge medical instructions, determined that the recorded blood sugar levels did not rise to the level that would require his calling for immediate medical assistance.

The evidence in the record thus does not indicate that Wells was malicious, willful, or reckless in declining to pursue further medical care for

No. 22-30220

Addington. Accordingly, we cannot say that Wells's actions (or lack thereof) rose to the level of intention, malice, willfulness, or recklessness that would place him under the intentional misconduct exception to section 9:2798.1's immunity provisions. Section 9:2798.1 instead operates to shield Wells from state tort liability for negligence, and the district court erred in holding otherwise.

## V.

For the foregoing reasons, we REVERSE the judgment of the district court.