# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 14, 2021

Lyle W. Cayce
Clerk

No. 20-50966

Zurich American Insurance Company,

*Plaintiff—Appellant*,

*versus*

Arch Insurance Company,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:19-cv-24

Before Davis, Haynes, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

This appeal arises from a highway construction project gone wrong. The question presented is whether the issuer of a commercial general liability policy, Arch Insurance Company, has a duty to defend the project's general contractor. The district court answered no. We disagree and reverse.

I.

A.

SH 130 Concession Company, LLC ("Developer") holds a concession to design and construct a 41-mile stretch of highway ("Project")

running from Mustang Ridge to the I-10 connector near Seguin, Texas. The Developer hired Central Texas Highway Constructors, LLC ("CTHC") as the Project's general contractor. CTHC in turn hired Archer Western Contractors, Ltd. ("Archer Western"), among others, as a subcontractor. As most relevant here, Archer Western agreed to construct certain drainage systems for the Project.

Archer Western obtained annual commercial general liability ("CGL") policies from Arch Insurance Company ("Arch") that were effective from June 1, 2009, through June 1, 2018 (collectively, "Policy"). In the Policy, Arch assumed both a duty to indemnify and a duty to defend. As to the duty to indemnify, the Policy provides: "[Arch] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." As to the duty to defend, the Policy states: "[Arch] will have the right and duty to defend the insured against any 'suit' seeking those damages. However, [Arch] will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." This case involves only Arch's duty to defend.

The subcontract required Archer Western to name CTHC as an "additional insured" on its Policy. Archer Western did so with two endorsements. First, the "Completed Operations Endorsement" extends coverage to the "additional insured [CTHC] . . . with respect to liability for 'bodily injury' or 'property damage' caused, in whole or in part by, 'your work' [Archer Western's] at the location designated . . . performed for that additional insured [CTHC]." Second, the "Ongoing Operations Endorsement" extends coverage under the Policy to the "additional insured [CTHC] . . . with respect to liability for 'bodily injury', 'property damage' or 'personal and advertising injury' caused, in whole or in part, by . . . [Archer Western's] acts or omissions . . . in the performance of [its] ongoing

operations for the additional insured [CTHC]." In sum, these two endorsements extend coverage under the Policy to CTHC for work *Archer Western* performed.

Work on the Project wrapped up in October 2012. On September 6, 2017, the Developer sent CTHC a notice of claim. About six weeks later, on October 20, 2017, the Developer requested arbitration against CTHC. The Developer alleged that CTHC and two other named contractors "fell far short of meeting their contractual obligations." Portions of the Project had "beg[un] to crack and heave before the road even opened to the public, and these pavement failures . . . indicated that a significant underlying error in design and construction was causing the pavement to fail." The Developer also alleged that an investigation revealed that "CTHC improperly designed and constructed the pavement subgrade in such a way that it would inevitably expand" and caused the alleged deficiencies. It sought "to recover the full cost of remediating the project-wide defect in th[e] arbitration, along with other damages." Throughout this opinion, we'll refer to this arbitration proceeding (*Developer v. CTHC*) as the "underlying litigation" or the "underlying arbitration."

The Developer's request for arbitration also incorporated its notice of claim against CTHC. The notice of claim, in turn, referenced several bridge inspection reports detailing alleged defects in portions of the Project. As most relevant here, the bridge inspection reports found that at least one bridge abutment "appear[ed] to have rotated . . . due to moderate erosion caused by [a] deck drainage outlet pipe between girder 1 and 2[,] . . . which ha[d] created a [three-foot-deep] void." The reports also noted that another bridge abutment had experienced "moderate erosion due to [a] deck drainage outlet."

The Developer later filed a more detailed statement of claim in the underlying arbitration. In it, the Developer alleged three categories of defects in the Project: "(1) pavement defects, (2) slope defects, and (3) bridge defects." As to category (1), the Developer alleged that "the cracking and heaving in the roadway was the result of differential movement related to subgrade heave and sulfate reactions," which itself was "the direct result of CTHC's failure to design and construct the [Project] subgrade and pavement structure in accordance with its contractual obligations." As to category (2), the Developer alleged that CTHC's design choices had caused slopes adjacent to the highway to fail. And as to category (3), the Developer alleged that CTHC "failed to properly account for the soils at the bridges, and in doing so, created problems such that multiple bridges—the most long-lived assets of a road's infrastructure—are exhibiting early signs of aging and premature failure." In sum, the Developer's claims in the underlying arbitration alleged that poor drainage caused physical damage to parts of the Project.

## B.

Given the Developer's claims in the underlying arbitration against CTHC, CTHC's insurer—Zurich American Insurance Company ("Zurich")—invoked Arch's duty to defend CTHC. Arch refused. So Zurich sued. It sought a declaration that Arch owes CTHC a duty to defend, as well as reimbursement for defense costs already incurred. The parties eventually cross-moved for summary judgment, which the district court referred to a magistrate judge.

The magistrate judge issued a report and recommendation that Arch's motion for summary judgment be granted because none of the Developer's claims potentially fell within the Policy's coverage. In reaching that recommendation, the magistrate judge determined that some of the

Developer's allegations concerned damage to Archer Western's own work, which was expressly excluded from the Policy's coverage; that the Developer never alleged Archer Western caused the complained-of defects; and that some of the Developer's allegations could only hypothetically implicate Archer Western's work.

The district court adopted that recommendation and entered partial final judgment in favor of Arch under Federal Rule of Civil Procedure 54(b). Zurich timely appealed. We have jurisdiction under 28 U.S.C. § 1291. It's undisputed that we must apply Illinois law. And our review is *de novo. See Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 368 (5th Cir. 2021) (applying *de novo* review to summary judgment decision); *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) (holding that, under Illinois law, interpretation of an insurance policy is a question of law that we review *de novo*).

## II.

### A.

It's undisputed that if either of the Policy's two endorsements potentially applies, then Arch (the issuer of the Policy) owes a duty to defend CTHC (the additional insured in the endorsements) in the underlying arbitration (*Developer v. CTHC*). It's also undisputed that the applicability *vel non* of the endorsements turns on whether Archer Western (the primary insured) performed work that could trigger its Policy with Arch. Complicated as this might seem, the web of the insurance contracts creates a relatively straightforward question: Do the Developer's claims against CTHC in the underlying arbitration potentially implicate Archer Western's drainage-system work, such that Archer Western's insurer (Arch) owes a duty to defend the additional insured (CTHC)? The answer is yes.

"To determine whether an insurer has a duty to defend its insured from a lawsuit, a court must compare the facts alleged in the underlying complaint to the relevant provisions of the insurance policy." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "If the [relevant documents] allege facts within or potentially within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent." *Northbrook Prop. & Cas. Co. v. Transp. Joint Agreement*, 741 N.E.2d 253, 254 (Ill. 2000); *see also Valley Forge*, 860 N.E.2d at 314–15. The alleged facts need only be "*potentially* within" the policy's coverage. *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997) (emphasis added); *see also, e.g.*, *Valley Forge*, 860 N.E.2d at 314–15. For this reason, the "threshold that [the relevant documents] must satisfy to present a claim of potential coverage is low." *LaGrange Mem'l Hosp. v. St. Paul Ins. Co.*, 740 N.E.2d 21, 27 (Ill. App. Ct. 2000); *see also, e.g.*, *Bituminous Cas. Corp. v. Gust K. Newberg Constr. Co.*, 578 N.E.2d 1003, 1006 (Ill. App. Ct. 1991) (Threshold is "minimal."); *Del Monte Fresh Produce N.A., Inc. v. Transp. Ins. Co.*, 500 F.3d 640, 643 (7th Cir. 2007) (Illinois law) ("In a duty-to-defend action, we begin with the deck stacked in favor of the insured.").

In comparing the Policy's language to the allegations in the underlying litigation, we must "liberally construe[]" the allegations "in favor of the insured." *Valley Forge*, 860 N.E.2d at 314; *see also, e.g.*, *Diamond State Ins. Co. v. Chester-Jensen Co.*, 611 N.E.2d 1083, 1087 (Ill. App. Ct. 1993) ("The complaint must be liberally construed and all doubts resolved in favor of coverage for the insured."); *Westfield Ins. Co. v. W. Van Buren, LLC*, 59 N.E.3d 877, 882 (Ill. App. Ct. 2016) (same); *Ill. Tool Works Inc. v. Travelers Cas. & Sur. Co.*, 26 N.E.3d 421, 428 (Ill. App. Ct. 2015) (describing the "well-settled principle followed by Illinois courts: that vague, ambiguous allegations against an insured should be resolved in favor of finding a duty to defend"). We also must construe any ambiguity in the Policy "strictly against

No. 20-50966

the insurer [that] drafted the policy." *Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1017 (Ill. 2010) (quoting *Koloms*, 687 N.E.2d at 75). Put together, "[a]n insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the [relevant documents] that the allegations [in the underlying litigation] fail to state facts which bring the case within, *or potentially within*, the policy's coverage." *Northbrook*, 741 N.E.2d at 254 (emphases added); *see also Valley Forge*, 860 N.E.2d at 315.

B.

We begin, as always, with the relevant text. The Policy provides in pertinent part:

> b. This insurance applies to "bodily injury" or "property damage" only if:
>
> > (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
> >
> > (2) The "bodily injury" and "property damage" first takes place during the policy period regardless of when the "occurrence" giving rise to "bodily injury" or "property damage" takes place.

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in 'bodily injury' or 'property damage', neither expected nor intended from the standpoint of any insured."[1] It defines "property damage" as:

---

[1] Before June 1, 2010, the Policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." But in these circumstances, the definitions are materially identical for two reasons. First, the Policy before the June 1, 2010 clarification had an exclusion, stating that the "insurance does not apply to . . . '[b]odily injury' or 'property damage' expected or intended from the

No. 20-50966

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Put together, the Policy applies where Archer Western (1) causes an accident (2) that causes property damage (3) during the policy period.

With the Policy's three requirements so understood, we turn next to the allegations in the underlying litigation. Here, the underlying litigation is the Developer's arbitration against CTHC. The parties agree that we may consider the allegations in the Developer's request for arbitration, its notice of claim, and its statement of claim, including other documents incorporated by reference. The Developer's allegations in those documents potentially satisfy all three of the Policy's aforementioned requirements. That's because the Developer is complaining that drainage work performed by Archer Western damaged the Project—thus potentially triggering Archer Western's Policy and Arch's duty to defend under that Policy.

---

standpoint of the insured." Second, we must give the definition its "plain, ordinary, and popular meaning." *Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 494 (Ill. 2001) (quotation omitted); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 228 (2012) ("Sometimes a definition itself contains a term that is not clear. When that is the case, the usual criteria of interpretation . . . are brought to bear."). And according to Illinois courts, the ordinary meaning of "accident" in the context of an insurance policy indicates that the "result" was "neither expected nor intended." *Pekin Ins. Co. v. McKeown Classic Homes, Inc.*, 161 N.E.3d 1059, 1070 (Ill. App. Ct. 2020); *see also ibid.* ("The use of the word 'occurrence' in insurance policies broadens coverage and eliminates the need to find an exact cause of damages as long as they are neither intended nor expected by the insured." (quotation omitted)); *W. Bend Mut. Ins. Co. v. People*, 929 N.E.2d 606, 614 (Ill. App. Ct. 2010) ("The policies specify that an occurrence is an accident. The natural and ordinary consequences of an act do not constitute an accident.").

First, the accident. The Developer alleged that work on the highway's drainage system led to unintentional and unexpected damages to the Project. Archer Western, of course, performed work on that drainage system. And there's no contention that Archer Western intentionally constructed that system to damage the Project. Nor is there any contention that anyone expected Archer Western's drainage system to damage the Project. So the allegations potentially meet the Policy's definition of an "occurrence," *i.e.*, an "accident."

Second, the property damage. The Developer alleged that the improperly installed drainage systems caused "soil erosion" that in turn caused, among other things, "abutment movements," "shear[ed] . . . bearing pads," and "crack[ed] . . . riprap." Specifically, in the request for arbitration, the Developer incorporated by reference several bridge inspection reports that detailed alleged defects in the Project. Those reports alleged that abutments adjacent to SH 130 had "rotated towards [the highway] due to moderate erosion caused by [a] deck drainage outlet pipe." And another abutment "ha[d] moderate erosion due to [a] deck drainage outlet." The statement of claim further alleged "poor drainage" was the cause of various injuries:

> [A]butment movements caused by differential soil movement . . . as well as soil erosion caused by poor drainage, have closed the expansion joints, sheared the bearing pads, caused heaving of the approach slabs, brought several of the girders into contact with the backwall, displaced the riprap, and resulted in cracks in the riprap, the backwalls and the wingwalls.

Soil, bearing pads, and riprap are "tangible property." Erosion, piercing, and cracking are "physical injuries." *See Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 502 (Ill. 2001) ("[U]nder its plain and ordinary meaning, the term 'physical injury' unambiguously connotes damage to

tangible property causing an alteration in appearance, shape, color or in other material dimension."). And the allegations use the phrase "caused by"—the same phrase used in the applicable Policy provisions.[2] Thus, the Developer's allegations in the underlying litigation potentially satisfy the Policy's definition of "property damage."

Third, timing. Under the Policy, "property damage" "is deemed to first take place at the earliest of when" the damage "began" or "first manifest[ed]." The Policy also makes clear that "all resulting loss of use of that property" is "deemed to occur at the time of the physical injury that caused it." All agree that the Policy covered the time period between June 1, 2009, and June 1, 2018. The Developer alleged that some of the defects "first manifest[ed]" in 2014. That's well within the Policy's effective period. Plus, all the allegations in the notice of claim and request for arbitration were sent in 2017—still before the coverage period ended.

There's still more. The Developer also alleged that the defects are "rooted in the same problem" as earlier damage and are "due to" issues "present" earlier. So not only did the Developer allege that the physical injury manifested during the coverage period, but it also alleged that later injuries trace to when the work was performed. And there's no dispute that Archer Western performed its actions during that coverage period. Because the Policy specifies that "all resulting loss of use of that property" is "deemed to occur at the time of the physical injury that caused it," any

---

[2] It's true that the Developer's allegations in the underlying litigation sometimes also use the phrase "due to." But given that we must liberally read the allegations (and the Policy) in the insured's favor and that the allegations need only "potentially" fall within coverage, we see no material difference between "caused by" and "due to." *See, e.g.,* *Valley Forge*, 860 N.E.2d at 314–15; *Wilson*, 930 N.E.2d at 1017; *Koloms*, 687 N.E.2d at 75.

No. 20-50966

damage alleged to result from the initial injury potentially comes within the Policy's effective dates.[3]

## C.

Arch makes two counterarguments. Both fail.

### 1.

Arch argues that the Developer does not expressly state a claim against Archer Western in the underlying arbitration (*Developer v. CTHC*). Indeed, the Developer's claims in that underlying arbitration do not even mention Archer Western by name. Thus, Arch contends, the Developer's claims against Archer Western are at most *implied* by its claims against CTHC and thus should not trigger Arch's duty to defend under the Policy.

We disagree. That's for at least three reasons.

First, the Developer's allegations implicating Archer Western are specific enough. The Developer alleged that Archer Western's work (installation of the drainage system) was defective and caused erosion that in turn caused damage to other property (*e.g.*, bearing pads and riprap). That is an express allegation, not an implied one.

In these circumstances, it doesn't matter that the allegations failed to expressly name Archer Western while naming other subcontractors. Arch hasn't pointed to anything in the allegations that suggests the named subcontractors were exhaustive. *See Am. Econ. Ins. Co. v. Holabird & Root*, 886 N.E.2d 1166, 1179 (Ill. App. Ct. 2008) ("The underlying complaint does

---

[3] Arch insists that Zurich forfeited any arguments on timing for failing to argue it in its opening brief. Not so. "We do not require a litigant to anticipatorily rebut all potential arguments his adversary may raise. Failing to do so is not a forfeiture." *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 296 n.2 (5th Cir. 2019); *see also United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009).

not allege that these were the only entities involved in the construction of the City's space and the third-party complaint confirms that there was at least one other subcontractor on the site."). The allegations therefore "impl[y] . . . that other parties may have been involved in the project." *Id.* at 1180. That's especially true given that we must read the allegations in the insured's favor. So in this respect, the allegations are specific enough.

It also doesn't matter that the Developer's primary focus in the arbitration documents is on the work done by CTHC rather than Archer Western. That's because the "duty to defend extends to cases where the complaint alleges several causes of action or theories of recovery against the insured, one of which is within the coverage of a policy while the others may not be." *Md. Cas. Co. v. Peppers*, 355 N.E.2d 24, 28 (Ill. 1976); *see also Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005). That's so even though "the insurer may become obligated to defend against causes of action and theories of recovery that the policy does not actually cover." *Stoneridge Dev. Co. v. Essex Ins. Co.*, 888 N.E.2d 633, 644 (Ill. App. Ct. 2008). The bottom line is that it doesn't matter that *most* of the Developer's causation allegations concern CTHC's defective construction; what matters is that *some* of those allegations concern Archer Western's allegedly defective work on the Project's drainage systems.

Second, Illinois law doesn't require express allegations. As one Illinois state court put it, the contention that the relevant documents "must explicitly identify the claim that is within the 'additional insured' coverage represents an unduly narrow reading of the applicable test." *Pekin Ins. Co. v. Hallmark Homes, LLC*, 912 N.E.2d 250, 257 (Ill. App. Ct. 2009). And as another explained, the relevant documents "need not allege or use language affirmatively bringing the claims within the scope of the policy." *W. Cas. & Sur. Co. v. Adams Cnty.*, 534 N.E.2d 1066, 1068 (Ill. App. Ct. 1989); *see also Int'l Ins. Co. v. Rollprint Packaging Prods., Inc.*, 728 N.E.2d 680, 688 (Ill. App.

Ct. 2000). That's for good reason: "The question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action." *Int'l Ins. Co.*, 728 N.E.2d at 688 (citing *W. Cas. & Sur. Co.*, 534 N.E.2d at 1068).

Third, Arch's principal authority—*Amerisure Mutual Insurance Co. v. Microplastics, Inc.*, 622 F.3d 806 (7th Cir. 2010)—is critically different. In that case, a vehicle-parts manufacturer (Microplastics) produced faulty door-latch assemblies and then sold them to an original equipment manufacturer (Valeo). *Id.* at 808. Microplastics sued for breach of contract, *id.* at 809; Valeo counterclaimed seeking "setoff or recoupment of all damages it has incurred on account of Microplastics' breaches," including "costs charged to Valeo [by its customers] associated with the defects," *id.* at 811.

The question presented was whether the "general allegations" in Valeo's counterclaim triggered the insurance provider's duty to defend Microplastics. *Ibid.* The Seventh Circuit answered no. In reaching that answer, the court recognized that the allegations "d[id] not logically foreclose the theoretical possibility that" there was "potentially covered damage to property beyond the defective products." *Ibid.* Still, the allegations were so "vague" that it required "hypothesizing situations" to "fill in details" to show the potentiality of covered "property damage." *Id.* at 812.

Such hypothesizing isn't necessary here. The Developer specifically alleged the relevant defective construction, the property damage caused by the drainage systems, and when the damage occurred. There's no reasonable dispute that multiple parties, including Archer Western, were working on the Project. And it's reasonable to infer that work performed by one subcontractor likely damaged another subcontractor's work on this Project.

It's therefore more than a "theoretical possibility" that the allegations in the Developer's underlying arbitration raised a covered-property-damage claim.

2.

Arch also argues that the Developer's allegations do not trigger the Policy's "property damage" provision because Archer Western damaged only its own work. It's true that, under Illinois law, an insured's damage to its own work cannot constitute covered "property damage." *Eljer Mfg.*, 757 N.E.2d at 503 (quotation omitted). But it's incorrect that the own-work exclusion applies here.

Take, for example, *Ohio Casualty Insurance Co. v. Bazzi Construction Co.*, 815 F.2d 1146 (7th Cir. 1987) (Illinois law). There, a construction company negligently poured concrete while renovating a building parking garage, compromising the structural integrity of the whole garage. *Id.* at 1147. The court concluded that the company caused damage to work other than its own. *Id.* at 1148. Specifically, the court explained: "Had [the company] contracted to construct an entirely new building . . . any damage to or defects in that building, which would be defined as the property or work product of [the company], would not be covered under the policy. But that is not the case now before us." *Id.* at 1148–49. Rather, the complaint alleged "damage to property other than [the company's] own work or product, namely the structure of the existing garage." *Id.* at 1149.

So too here. Archer Western's work involved installing the drainage systems. And the subcontract expressly exempted from Archer Western's scope of work the property that was damaged—*e.g.*, preparing the abutment

soil, as well as providing bearing pads and riprap. So the Developer alleged damage to property *outside* Archer Western's own work.[4]

\* \* \*

The Developer's claims against the Project's general contractor implicate defective construction of the Project's drainage systems. Archer Western constructed those drainage systems. Therefore, Archer Western's CGL insurer (Arch) owes a duty to defend the general contractor (CTHC) in its underlying litigation with the Developer. The district court's judgment in favor of Arch is REVERSED.

---

[4] Arch insists that Zurich forfeited any arguments responding to this "alternative reason[]." Again, no. *See supra* n.3; *Hoyt*, 927 F.3d at 296 n.2; *Ramirez*, 557 F.3d at 203.