# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 10, 2022

Lyle W. Cayce
Clerk

No. 21-60753

Kameko R. Williams, *as the administratrix of the* Estate of James Lee Brownlee, *and as natural daughter and next friend of* James Lee Brownlee, Deceased, *and on behalf of* all of the Heirs-at-Law and Wrongful Death Beneficiaries of James Lee Brownlee, Deceased; The Estate of James Lee Brownlee,

*Plaintiffs—Appellants*,

*versus*

Patrolman Adam Zachary, *in his individual capacity*; Deputy Cody Shankle, *in his individual capacity*; Deputy Diana Westmoreland, *in her individual capacity*; Sheriff James D. Meyers, *in his official capacity*; Other Unknown John and Jane Does 1-10; Chickasaw County, Mississippi; Chickasaw County, Mississippi Sheriff's Department,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:18-cv-128

No. 21-60753

Before Higginbotham, Higginson, and Oldham, *Circuit Judges*.

Per Curiam:*

Police arrested James Brownlee on the evening of July 4, 2016, and booked him into the Chickasaw County, Mississippi jail that night. Brownlee, who had no known preexisting conditions, went into cardiac arrest and died early the next morning. Brownlee's daughter sued law enforcement officers and the county. The district court granted summary judgment, and we affirm.

I.

A.

For summary-judgment purposes, we view the facts in the light most favorable to the non-movant. *E.g.*, *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Here, that is Kameko Williams—Brownlee's daughter—who brings this lawsuit on Brownlee's behalf.

We summarize (1) events starting with Brownlee's first encounter with police and ending when Chickasaw County jailors took custody of him. These facts are primarily relevant to Mississippi Highway Patrol Trooper Adam Zachary. Then we summarize (2) events starting with the jailors' custody and ending with Brownlee's death. These facts are primarily relevant to Jailor Cody Shankle.

1.

On July 4, 2016, Trooper Zachary and Trooper Kindle Jones were manning a traffic checkpoint. They stopped James Brownlee at that checkpoint. Mrs. Brownlee, Brownlee's wife, was driving. But the officers suspected that Brownlee had been driving drunk, and that the pair had stopped the car about 100 yards shy of the checkpoint in order to switch

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-60753

drivers. After some discussion not relevant here, Zachary arrested Brownlee on various misdemeanor charges.

Shortly after the stop, Mrs. Brownlee saw her husband "leaning over" in a way that made her think "he was sick." (But there is no affirmative indication that Zachary saw this.) Brownlee was very intoxicated at the time, nearly double the legal limit for driving.

Before driving Brownlee to the jail, Zachary stopped along the side of the road, rolled down his window, and talked with Jones. Brownlee repeatedly complained of back pain and said he needed to stand up and stretch. Brownlee said, "my back is killing me." Zachary and Jones both heard this, and Jones opened up the door to let Brownlee get out and stretch. Brownlee also said the handcuffs were hurting him, so Zachary took them off and "swapped them to the front."

On the way to the jail, Brownlee said, "Man, I don't know if I am going to make it to the jail. I just want to stand up." So Zachary turned on his patrol car's blue lights and sped up in order to get to the jail faster. Zachary did not stop at the hospital, and Brownlee did not ask him to do so. Zachary's car had a recording system that turns on by default when the blue lights are on, but it was switched off.

Upon arrival, Zachary transferred Brownlee into the custody of jail sheriffs. There is nothing in the record establishing that Zachary told the jail sheriffs about Brownlee's back pain. Before Zachary left, Brownlee told him he wanted to see a doctor. Zachary responded that Brownlee had a right to one phone call "for legal or medical assistance." A phone was available, but Brownlee did not call a doctor. Williams does not contend that Zachary had any reason to believe Brownlee had a pre-existing medical condition.

The record includes various video recordings, including a recording of the room where Brownlee was held during the booking process. Williams's

brief claims the video footage of Brownlee in the booking room shows that Brownlee was in significant pain. Zachary and Shankle say Brownlee's extreme intoxication, along with his upset stomach, explain the fact that Brownlee seemed unable to get comfortable in the booking room. For purposes of this appeal, we assume the video establishes that Brownlee was in pain. We also assume that both Zachary and Shankle saw Brownlee's indicators of pain.

2.

The district court found the following five facts, none of which Williams now contests, in its summary-judgment order. First, Shankle booked Brownlee into the jail and put him in a segregated cell specifically for intoxicated inmates. Second, neither Zachary, nor Brownlee himself, nor anybody else told Shankle that Brownlee had any pre-existing medical condition. Third, Brownlee filled out an intake form and did not indicate any preexisting medical condition—and he specifically indicated on the form that he did not have a heart condition. Fourth, Brownlee said his stomach hurt during the booking process, and Shankle gave him permission to use the restroom. And fifth, Brownlee made no further complaints of stomach pain after returning from the restroom.

Once Brownlee was booked and in his cell, Shankle and Deputy Diana Westmoreland ("Westmoreland") checked on him intermittently—an average of once every half-hour or so. Williams does not contest this, but she says Shankle and Westmoreland checked on Brownlee less thoroughly than they should have. For instance, she points to deposition testimony that Westmoreland "could have done better," and that she *looked* into Brownlee's cell without *stopping* outside the cell. We assume Williams is right about this. We also assume, as Williams contends, that Shankle signed off as

No. 21-60753

having checked on Brownlee in some instances when Westmoreland was in fact the one doing the checking.

In the morning, Shankle went to Brownlee's cell to bring him his breakfast. Brownlee did not respond, so Shankle eventually entered. Brownlee was unresponsive. Shankle called for help, and several officers and medical personnel responded. They performed CPR, but it did not work. Brownlee was pronounced dead at 6:28 a.m. The cause of death was listed as hypertension and arthroscopic vascular disease. Williams does not now contend that this cause of death is inaccurate.

B.

Williams brought this suit under 42 U.S.C. § 1983. She sued Zachary, Shankle, and Westmoreland[1] in their individual capacities, arguing the officers violated Brownlee's Fourteenth Amendment right to adequate medical care as a pretrial detainee.

She also brought a claim against Chickasaw County, Mississippi and Sheriff Myers (in his official capacity). We refer to the County and Myers collectively as "Chickasaw" or the "County." Williams argued Chickasaw was liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), on the ground that the County had violated Brownlee's constitutional rights by failing to train its officers.

---

[1] Williams purports to bring a claim against Westmoreland in her individual capacity. But the district court dismissed this claim on the ground that Westmoreland never received adequate process. Williams in no way contests that holding. Thus, we hold Williams forfeited the issue by failing to brief it, and we affirm the dismissal as to Westmoreland on that ground. *See Ctr. for Bio. Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Petitioners forfeited [an] argument by failing to include it in their opening brief."). We discuss Westmoreland herein only to the extent her actions are relevant to the other defendants.

After some discovery, the defendants moved for summary judgment under Federal Rule of Civil Procedure 56. The court held Zachary and Shankle were entitled to qualified immunity because, among other things, they had not violated a clearly established constitutional right. And the court held Williams had failed to show Chickasaw was liable under *Monell*. So the court granted summary judgment in favor of Zachary, Shankle, and Chickasaw.

Williams timely appealed. We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

## II.

We review a grant of summary judgment *de novo. E.g.*, *Zurich Am. Ins. Co. v. Arch Ins. Co.*, 20 F.4th 250, 254 (5th Cir. 2021). Generally, as mentioned above, we construe the facts in the light most favorable to the non-movant (here, Williams). *Brown*, 623 F.3d at 253. And generally, summary-judgment movants (here, the defendants) bear the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

We (A) hold that Zachary and Shankle are entitled to qualified immunity. Then we (B) affirm the district court's grant of summary judgment to Chickasaw.

## A.

We begin by outlining (1) the rules governing qualified immunity. Then we hold (2) Williams's argument fails (as to both officers) because her brief frames the constitutional issue at an impermissibly high level of generality. Next, we hold (3) Williams's argument fails (as to both officers) because, even if she had framed the issue with the requisite specificity, she does not point to any precedents that clearly establish the right the officers

are supposed to have violated. And finally, we hold (4) to the extent there is clearly established law in this case, it cuts against Williams rather than in her favor—again, as to both officers.

1.

Because the officers have asserted qualified immunity in good faith, Williams bears the burden of showing a genuine dispute of material fact on that issue. *See Joseph v. Bartlett*, 981 F.3d 319, 328–29 (5th Cir. 2020). More specifically, Williams must first show there is a genuine dispute of material fact concerning "whether the officer[s] violated a constitutional right." *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019); *Joseph*, 981 F.3d at 329. Second, she must show there is a genuine dispute of material fact concerning "whether the right at issue was clearly established at the time of the alleged misconduct." *Morrow*, 917 F.3d at 874 (quotation omitted); *Joseph*, 981 F.3d at 329. "We can decide one question or both." *Morrow*, 917 F.3d at 874.

In this case, we need decide only the second question—whether the officers violated clearly established law. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (quotation omitted). Importantly for present purposes, "we must frame the constitutional question with specificity and granularity." *Morrow*, 917 F.3d at 874–75. It is almost never enough to point to "general rules set forth in" existing precedents: General rules "do not by themselves create clearly established law outside an obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quotation omitted); *see also al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, *but existing precedent must have placed the statutory or constitutional*

*question beyond debate*." (emphasis added)). For purposes of this appeal, "[w]e assume without deciding that our precedent," as opposed to Supreme Court precedent, "could, in an appropriate case, clearly establish the law." *Cleveland v. Bell*, 938 F.3d 672, 677 (5th Cir. 2019).

2.

Williams argues that Zachary violated one of Brownlee's clearly established constitutional rights. Williams points to the Fourteenth Amendment, which guarantees that pretrial detainees will not "have their serious medical needs met with deliberate indifference on the part of . . . confining officials." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (using this formulation in a rule statement). "To establish a constitutional violation [on this theory], a plaintiff must show that the defendant: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk." *Cleveland*, 938 F.3d at 676 (5th Cir. 2019) (quotation omitted).

Williams's brief first states the no-deliberate-indifference rule, citing *Thompson*. Then it applies that general rule to the facts of this case. It concludes that Zachary and Shankle violated Brownlee's clearly established right to adequate pretrial care by showing deliberate indifference to his medical needs.

That is not nearly specific enough. To the extent (if any) cases like *Thompson* clearly establish law, they do not do so merely by *stating* the general no-deliberate-indifference rule. They do so by *applying* the rule to a particular set of facts. *See Dyer v. Houston*, 964 F.3d 374, 384 (5th Cir. 2020) (running down the facts in *Thompson* and explaining *Thompson* had clearly established law with respect to factually similar scenarios—not in virtue of its mere rule statement); *see also infra*, Part II.A.3 (discussing these facts in more detail).

"The dispositive question in this step of the qualified-immunity analysis is whether the violative nature of *particular* conduct is clearly established. Cases that are too factually distinct to speak clearly to the specific circumstances here are not enough to deny qualified immunity." *Cleveland*, 938 F.3d at 677 (quotations omitted). It is simply not enough to rely on general rule statements, as most of Williams's briefing does. We therefore reject Williams's impermissibly high-level framing of the right at issue. *See Morrow*, 917 F.3d at 875 ("The Supreme Court has 'repeatedly told courts not to define clearly established law at [a] high level of generality.'" (quoting *al-Kidd*, 563 U.S. at 742) (alteration omitted)).

3.

Even if Williams had framed the right with adequate specificity, she has not shown that either Zachary or Shankle "violated clearly established law." *Morrow*, 917 F.3d at 874. That is because Williams points to no "existing precedent" that "place[s] the . . . constitutional question[s]" in this case "beyond debate." *al-Kidd*, 563 U.S. at 741.

Consider the cases Williams does cite. One is *Nerren v. Livingston Police Dep't*, 86 F.3d 469 (5th Cir. 1996), a case where we found officers had violated a detainee's clearly established constitutional rights. *See id.* at 473. The detainee's "face and chest were marred with abrasions, he was in [obvious] pain, and he informed the Arresting Officers that he needed medical attention" for his injuries. *Id.* The detainee's need for care was obvious because the officers *knew* he "had recently been involved in a multiple vehicle . . . accident." *Id.* But the officers flat-out "denied [the detainee's] request for the express reason that he had fled the scene of the accident without regard for the plight of the other victims." *Id.* We affirmed the district court's denial of qualified immunity. *Id.* at 474.

No. 21-60753

*Nerren* does not place it "beyond debate" that Zachary violated Brownlee's constitutional rights. *al-Kidd*, 563 U.S. at 741. It is undisputed that Brownlee complained only of wrist pain, back pain, and stomach discomfort—and only intermittently at that. And Zachary, unlike the officers in *Nerren*, was not on notice that Brownlee had recently undergone significant trauma. (This is true even on the assumption that the booking-room video demonstrates Brownlee was in significant pain and not just discomfort.) Further, rather than denying Brownlee care, Zachary explicitly told Brownlee he could use a readily accessible phone to call a doctor if he needed one.

Likewise with Shankle. Williams does not contend that Brownlee asked Shankle for medical care even once. That alone puts Shankle outside *Nerren*'s domain. Moreover, the only complaint Brownlee voiced to Shankle was that his stomach hurt, and the only thing he requested was to use the restroom. Shankle let him do so, then he went about business as usual—including checking on Brownlee at regular intervals. To describe those circumstances is to explain why *Nerren* has nothing to do with them.

Williams also cites *Thompson* and *Dyer*. Those cases have three key characteristics in common with each other—none of which appear in this case. First, in both *Thompson* and *Dyer*, the detainee was suffering from some form of psychosis. *See Thompson*, 245 F.3d at 452–54 (alcohol-related *delirium tremens*); *Dyer*, 964 F.3d at 377–78 (LSD). Second, the psychosis brought on seizures in each case, which in turn caused the detainee to thrash around and inflict himself with serious and obvious head wounds. *See Thompson*, 245 F.3d at 454 (Thompson had begun "to collide with objects in his cell, sometimes falling and striking his head against the window, floor or concrete bench."); *Dyer*, 964 F.3d at 378–789 (The detainee had "thrashed violently . . . and slammed his head . . . against the interior of [a patrol] car" a total of more than 40 times.). Third, the relevant officers had first-hand knowledge of

10

these traumatic injuries and nevertheless did little or nothing to help—and the detainees eventually died as a result. *See Thompson*, 245 F.3d at 454 (jailor provided some care but, at the end of her shift, specifically instructed her colleagues not to seek help without contacting her first and to contact her only if the detainee was "dying"); *Dyer*, 964 F.3d at 384–85 (despite witnessing the eventually fatal injuries as they occurred, transporting officers gave jailors the impression that all was well by "inform[ing] the jail sergeant only that Graham had been medically cleared at the scene"). Again, as the *Dyer* court itself explained, "*Thompson* define[d] clearly established law in sufficient detail to have notified the Officers [in *Dyer*] that their actions were unconstitutional" *precisely because* the cases shared these factual similarities. 964 F.3d at 384.

This case has none of the three characteristics that—as the *Dyer* court recognized—were central to *Thompson*'s holding. Brownlee (i) wasn't suffering from psychosis. He (ii) didn't have seizures, head injuries, or traumatic injuries of any sort. And (iii) because he didn't suffer traumatic injuries, the officers necessarily didn't witness him undergoing such injuries.

Those three dissimilarities mean that *Thompson*, just like *Nerren*, doesn't put it "beyond debate" that Zachary violated Brownlee's constitutional rights. *al-Kidd*, 563 U.S. at 741; *see also Dyer*, 964 F.3d at 384 (properly framing *Thompson* in very particularized terms). Put simply: Because there were no psychosis-related, self-inflicted injuries to ignore, Zachary can't have ignored them. That means Zachary can't have violated any law *Thompson* clearly established. Doubly so given that, even on Williams's own account, Zachary had no reason to believe Brownlee was at serious risk of a cardiac event. *See Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (*a fortiori* case holding that "the failure to alleviate a significant risk that the official should have perceived, *but did not*[,]

11

is insufficient to show deliberate indifference." (quotation omitted) (emphasis added)).

Exactly the same reasoning applies to Shankle. His actions and omissions have nothing to do with psychosis, seizures, head injuries, acute trauma, or anything else that was in play in *Thompson*. That is the end of the inquiry.

4.

"To the extent we can identify clearly established law" in this case, it supports Zachary and Shankle rather than Williams. *Morrow*, 917 F.3d at 877. *Estelle v. Gamble*, 429 U.S. 97 (1976), is arguably the most on-point case. There, a prisoner complained of back pain after a heavy object fell on him. *See id.* at 99, 107. Prison doctors "diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers." *Id.* at 107. When his symptoms worsened, they also treated him for high blood pressure. *See id.* at 99–100. But the prisoner continued to get worse, and the doctors eventually discovered that he had "irregular cardiac rhythm." *Id.* at 101. The prisoner sued a prison doctor. The Court held the doctor had not violated the prisoner's rights—*even if* the doctor had misunderstood the import of the prisoner's symptoms, and *even if* the doctor had accordingly mistreated the prisoner.

*Estelle* is not directly on point. But its facts are arguably closer to this case than are any of Williams's cited cases. There, as here, a detainee complained of severe back pain. There, as here, the relevant state employees treated the detainee as if he had a back injury. And there, as here, it turns out that there was something seriously wrong with the detainee's heart—not just his back. As far as it goes, then, *Estelle* seriously undercuts Williams's argument. *See id.* at 107–08 (holding there was no constitutional violation); *see also Batiste v. Theriot*, 458 F. App'x 351, 355–57 (5th Cir. 2012) (per

curiam) (granting qualified immunity to officers who failed to perceive that a detainee, whom they had just tased, was undergoing a drug-induced and ultimately fatal medical emergency).

## B.

Williams also urges us to vacate the district court's grant of summary judgment to Chickasaw. Williams argues Chickasaw failed to train its jailors adequately, and that this failure amounted to a violation of Brownlee's constitutional rights.

The Supreme Court says failure to train can give rise to municipal liability under *Monell*. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). But because *Monell* claims focus on *customs* and *policies*, failure-to-train theories are an awkward fit for the doctrine. The Supreme Court recognized this in *Canton*—and its solution was to make it very difficult to show liability on a failure-to-train theory. *Id.* (acknowledging, "[i]t may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees" but going on to provide a narrow route toward liability). The doctrinal bottom line: "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389; *see also id.* at 391 ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.").

In this case, the district court correctly explained Williams did not clear that high bar. The district court held that "[n]othing in the record indicates a systemic failure to provide officers with training related to inmate medical assessment, and certainly not to the level required to invoke the [*Canton*] exception to *Monell*." We agree. After reviewing the record and the

No. 21-60753

briefing, we see no reversible error in the district court's decision to grant summary judgment to Chickasaw.

AFFIRMED.